THE CITY OF CHICAGO, Appellant, *vs.* JOHN P. AGNEW *et al.* Appellees.

*Opinion filed June 16, 1914—Rehearing denied October 7, 1914.*

1. SURETIES—*what not such a violation of contract as releases surety company.* The fact that the commissioner of public works did not require the contractor on tunnel work to install a compressed air plant, as required by his contract with the city, is not such a material violation of the contract as releases the surety company which signed the contractor's bond, where it does not appear from the evidence that the installation of such a plant would have cheapened or facilitated the work or that it would have been anything but an additional expense to the contractor.

2. SAME—*when city's payment of reserve to other persons than contractor does not release the surety.* The surety company on the bond of a contractor for tunnel work is not released from liability because the city, after the contractor had defaulted, used the fifteen per cent reserve which it had retained under the contract, to pay for labor, material and supplies which it became necessary to use in pumping water and sewage from the excavation for the tunnel and preserving the work so far as it had gone.

3. SAME—*what is necessary in order to release surety company from liability.* In order to release a surety company from liability

on a public contractor's bond because of departures from the terms of the contract, the departures must be in material matters which operate in some way to prejudice the rights of the company, and technical violations, not operating in any way to the injury of the surety company, will not release it.

APPEAL from the Branch "D" Appellate Court for the First District;—heard in that court on appeal from the Municipal Court of Chicago; the Hon. FREEMAN K. BLAKE, Judge, presiding.

WILLIAM H. SEXTON, Corporation Counsel, (CHARLES M. HAFT, of counsel,) for appellant.

SHERIFF, DENT, DOBYNS & FREEMAN, for appellees.

Mr. JUSTICE CRAIG delivered the opinion of the court:

John P. Agnew entered into a contract on October 3, 1905, with the city of Chicago, by which he agreed to construct for said city a concrete tunnel 20 feet wide and 14 feet high, inside measurements, as shown by cross-section drawings in the specifications hereinafter referred to, under the shoal water of Lake Michigan, from and connected with a conduit in Lawrence avenue at the shore line, thence extending eastward 1370 feet under the lake. The contract further provided that said work should be done in accordance with the plans and specifications appended thereto and made a part thereof. The contract was executed on behalf of the city of Chicago by its commissioner of public works, and provided that the work was to be done under the supervision and direction of said commissioner, who had the authority to direct the progress of the work and to direct what force should be employed thereon, and said work was to be done to his entire satisfaction, approval and acceptance. Said commissioner was to have the final decision on questions arising as to the proper performance of said work, and as to whether the rate of progress thereon was such as

264 — 19

to correspond with the conditions of the contract. If the rate at which said work was to be performed was not in the judgment of said commissioner such as to insure its progress and completion in the time and manner stipulated, or if the work were improperly constructed, he could declare the contract forfeited either as to the whole or a portion of said work and re-let the same, or order the entire work reconstructed if improperly done. The contract also provided that if said commissioner deemed it necessary to make any alterations which should increase or diminish the expense, such alterations would not vitiate the contract or agreement but the commissioner should determine the value of the work so added or omitted, the same to be added to or omitted from the contract price, as the case may be. The contract also provided that if the rate of progress is satisfactory to the commissioner of public works, estimates will be issued to said Agnew during the making of said improvements for eighty-five per cent of the value of the work done and in place at the time of issuing such estimates, the remaining fifteen per cent being reserved until the final completion and acceptance of said work, at which time two-thirds of the said fifteen per cent shall be paid to the contractor, the remaining one-third to be retained for one year, as per the specifications which relate to insuring repairs to streets, etc., which might be made necessary. Agnew was to receive the sum of $138.33 per lineal foot for the work completed and finally accepted, and the same was to be completed on or before July 31, 1906. The specifications attached to the contract provided that monthly estimates were to be made to the commissioner of public works of the value of the work actually constructed and in its permanent place, and that on the sixth day of each month vouchers for eighty-five per cent of the estimated value of the work done the previous month would be issued, the remaining fifteen per cent to be reserved until final acceptance of the whole work, as provided in the contract. The specifications

further provided that the contractor should put in place a compressed air plant on said work and should use the pneumatic process of construction. The Title Guaranty and Surety Company (which will be referred to as appellee in this opinion) entered into a bond with said Agnew in the sum of $379,024 for the faithful performance of said contract on his part. On July 11, 1906, a partial estimate was submitted for work done to that date, for $26,424.44, of which $22,460.77, or eighty-five per cent, was paid. On October 1, 1906, the city council of the city of Chicago made an order authorizing the commissioner of public works to modify the contract of October 3, 1905, by extending the time for completion of the tunnel to May 31, 1907. Thereupon said city, through its commissioner of public works, entered into a supplemental contract to that effect, and Agnew waived his right to a bonus of $100 a day for each day he should complete said contract ahead of time, to which he was entitled under his original contract. On October 16, 1906, Agnew as principal and appellee as surety gave their bond to the city in the penal sum of $380,000, guaranteeing the performance by said Agnew of the original contract and supplemental contract. This is the bond sued on in this case.

October 18 estimates Nos. 2 and 3 were made for work done up to that time. On October 29 estimate No. 4 was made for the work up to that date. Said estimate included, among other items, 2538 lineal feet of box-heading, timbered and ready for concrete, to form the side walls of the tunnel. About that time Agnew was insisting that he should be allowed $20 a foot for the box-headings. The commissioner of public works consulted with the engineers who were engaged in supervising said work under him on behalf of the city, and with the chief engineer of the city, who reported that $12 a foot was a fair price for such work. The commissioner refused to allow the contractor the price he asked, $20 a foot, without an order from the

city council. Thereupon the city council, apparently at the instance of Agnew, passed an order authorizing the commissioner of public works, in preparing the estimates for the tunnel, to estimate the cost of constructing box-headings at the rate of $20 per lineal foot, provided, however, that before any such estimates were made said Agnew was to deliver to said commissioner of public works a good conveyance of all his right, title and interest in the plant used by him in the construction of said tunnel, said plant to become the property of Agnew whenever said tunnel was fully completed; and provided further that Joseph Hanreddy should execute and deliver to the city his bond in the penal sum of $40,000, on the condition that if said Agnew fail to complete said tunnel according to his contract, said Hanreddy should complete the same at a cost not exceeding the sum named in the contract between said Agnew and the city. Thereupon Agnew submitted estimate No. 5, the items of which are as follows: 256 lineal feet of breakwater protection around shaft, $3584; 13½ months' pumping sewage, $8775; 87 lineal feet conduit, timbered and ready for concrete lining, $6525; 54 lineal feet of concrete lining in place, $2665; 2506 lineal feet of box-heading, timbered and ready for vertical side walls, $50,120; 3½ cubic yards of rock excavation, $7; total, $71,676.44. Of the total amount, eighty-five per cent, or $60,924.97, (less $42,914.32, which had been paid on previous estimates, or $18,010.65 paid out on this estimate, and $10,-751.47, being fifteen per cent of all estimates to that date,) was retained. This will be hereafter referred to as estimate No. 5. After this, Agnew apparently did little or no work on the contract except pumping sewage to keep the work clear.

On March 12, 1907, the commissioner of public works served a written notice upon Agnew, and on appellee as surety, that he had annulled the Agnew contract, and notified appellee to complete the contract if it so desired, other-

wise he would re-advertise and re-let the contract. Appellee refused to complete Agnew's contract and claimed that its liability under the bond had been forfeited. The work was thereupon re-let to another contractor, and completed at a cost to the city, exclusive of extras, of $237,134.50, which included the sum of $10,800 paid as a bonus by the city for completing the contract 108 days ahead of time, the contractor being allowed $100 for every day. Adding $71,-676.44 (the amount paid by appellant on Agnew's account) to the said sum of $237,134.50, gives $308,810.94, the total amount paid by the city, exclusive of extras, for the tunnel. Subtracting from this total the original price of Agnew's contract, or $206,457.53, leaves the sum of $102,-353.41, which is the amount the city was obliged to pay to complete the tunnel over and above the amount of Agnew's contract, and for which amount it brought suit in the municipal court of Chicago.

The appellee surety company filed its affidavit of defense, claiming an absolute discharge from liability upon the bond on the following grounds: (1) That appellant, without the knowledge or consent of appellee, issued estimate No. 5, in which it increased the rate of payment for the box-headings from $12 to $20 per lineal foot, thereby making to Agnew an over-estimate and over-payment to the amount of $19,664, constituting a radical departure from the terms of the contract; (2) that appellant, without the knowledge or consent of appellee, paid out the fifteen per cent of the contract price provided by the contract to be held in reserve until the final completion and acceptance of the work, before the work was finally completed and accepted, and thereby committed a breach of the contract; (3) that appellant, without the knowledge and consent of appellee, committed other material breaches of and departures from its contract by estimating and paying Agnew for the following preliminary and temporary work: Breakwater protection around the shaft, pumping sewage

from section "D" conduit, constructing the shore shaft, and paying for the said box-headings at the rate of $12 per lineal foot before any part of the completed tunnel was constructed; (4) that appellant disregarded the provisions of the contract and specifications which provided that estimates be made monthly and vouchers given on the sixth day of each following month for eighty-five per cent of the estimates, and gave to Agnew three separate estimates and made three separate payments during the month of October, 1906; (5) that appellant disregarded section 38 of the specifications attached to and made a part of the contract, providing that the work of construction should be carried on by the pneumatic process, by advancing money to Agnew for work not done by said process; (6) that appellant failed to appraise Agnew's construction plant; (7) that the payment of $10,800 bonus to the company which finally constructed the tunnel was a material alteration of and departure from the Agnew contract. All the foregoing alleged changes were alleged to be without the knowledge or consent of appellee and to its material damage.

On the trial the municipal court allowed appellee credit for the $10,800 bonus paid as above, and a further credit of $20,008, which the court found was the amount allowed and paid for the box-headings over and above the rate of $12 per lineal foot, or a total of $30,808, which amount subtracted from $102,353.41 leaves $71,545.41, for which sum the municipal court entered judgment against appellee and in favor of appellant. On appeal to the Appellate Court for the First District that court sustained the contentions of appellee and held that under the foregoing circumstances the appellant had, without the knowledge and consent of appellee, made such a departure from the contract that it discharged appellee from liability on the bond, and reversed the judgment of the municipal court and remanded the case. From this judgment of reversal of the Appellate

Court the city was granted a certificate of importance and appealed to this court.

It is the contention of appellant that there was no modification of the contract or action taken by appellant in the premises that would discharge the surety, and that the city had the right, under the terms of the contract, to pay out the reserve as it did, and that the action of the city in paying out any portion of the fifteen per cent reserve, if it did so, was not a modification of the Agnew contract, and such action simply rendered the city liable to make good to the surety company any money that it paid out and which it should have retained; that such act would not release the surety but only diminish its obligation *pro tanto.* There is a line of decisions beginning with the case of *Calvert* v. *London Dock Co.* 2 Keen, 638, which holds that if the obligee in a bond given to secure performance of a building contract violates the terms of the contract by paying to the contractor money that according to the contract is to be held in reserve, such action will release the sureties from liability on the bond. That case is cited with approval in *Finney* v. *Condon,* 86 Ill. 78, in which case this court, while announcing the rule to be as above, held that the facts in that case did not bring the parties within the rule. In that case, under the contract which the defendant surety guaranteed, payment of eighty-five per cent of the work done was to be made semi-monthly on the architect's estimates. The architect testified that he gave estimates of the work done, and that he aimed to allow payment of the eighty-five per cent of such work and to withhold the fifteen per cent agreed upon or provided by the contract. The aggregate of all payments made actually exceeded eighty-five per cent of the contract price but it was not proved that it exceeded eighty-five per cent of the work actually done and as estimated by the architect. In that case the court said: "It is conclusively shown the work was taken too low, and it could not be finished within the contract

price. That fact may afford a reasonable explanation for the large estimates of the architect in proportion to the whole sum to be paid. The estimates made may not have exceeded eighty-five per cent of the materials furnished and work in fact done by the contractor, but in proportion to the whole sum to be paid they did exceed the per cent to be paid before the whole work should be completed. Relatively they were in excess of what the payments ought to have been but may not have been in fact. On this branch of the case the evidence is not very full. But conceding the fact the architect's estimates paid by plaintiff exceeded eighty-five per cent of the work done, we do not think plaintiff is in any manner responsible for the error made and ought not to lose his security because of an error of judgment in the architect, who was as much the umpire to determine such questions for the defendants as for other parties to the contract. Besides, plaintiff was not competent to make measurements of the work. He had no means of knowing he was making payments in excess of the sum agreed upon. His contract obligated him to make payments on the architect's estimates, and had he failed to do so the sureties with some propriety might have complained it was to their prejudice, and as plaintiff had not himself observed the contract they ought not to be bound. As we have seen, all parties had agreed the decisions of the architect upon questions arising under the contract should be conclusive upon them. Making estimates of the work was among the duties it was agreed he should perform, and no reason is perceived why his decisions as to the amount of work actually done were not as binding upon defendants as upon plaintiff or the contractor for whom they were sureties."

Appellee claims that in the case at bar the commissioner of public works was merely an officer of the city, and had no power, as arbitrator, to approve the estimates of the city for work in accordance with the contract. We do not

agree with this contention. By the terms of the contract the commissioner of public works was the one to decide whether the contractor was entitled to payments, and the amount. Any contract with a similar provision to which a municipality is a party must necessarily provide and name some one person who has the right to say whether any work for which a contractor was claiming pay had been properly done and the amount due, otherwise a provision for payments as the work progresses would be a nullity. We have heretofore set out what we think are the principal provisions of the contract and specifications bearing upon the points in issue, and we think it sufficiently appears that the commissioner of public works had the necessary authority to decide what payments should be made as the work progressed. He was the arbiter of such matters, and occupied the same position in that respect as the architect in the case of *Finney* v. *Condon, supra.*

There is no charge of fraud or bad faith on the part of the commissioner, but it is charged by counsel for appellee that the commissioner assisted Agnew and was lenient with him in the performance of his contract. This may be all true, but it is difficult to see how appellee's rights were prejudiced thereby. One violation of the terms of the contract charged by appellee is that the commissioner did not require Agnew to install a compressed air plant on the work but allowed the work to be done by Agnew without such plant. It does not appear from the evidence that the installation of such a plant would have cheapened or facilitated the work or that it would have been anything but an additional expense to the contractor. The commissioner of public works, testifying as a witness, stated that he did not require the contractor to install an air compressor and put in the air shafts required by the terms of the contract because that would not have aided the progress of the work; that it was only a matter of convenience and safety to the workmen. He satisfied himself that things were very well

protected and let the work proceed without them. The commissioner had the right, under the contract, to so decide, and appellee was not injured by such action on his part. The commissioner also testified that the contractor was hampered in his work for lack of funds and inability to get the necessary material with which to prosecute the work. He was adjudged a bankrupt soon after he ceased to work on the tunnel in question, and undoubtedly his financial standing was known to the material-men upon whom he depended for supplies to be used in the work. Under these circumstances, had the commissioner compelled him to go to the additional expense of installing an air compressing plant and air shafts he would ultimately have failed for that much more and there would have been additional liability on the bond.

It is further contended that payments were made in excess of the work done, contrary to the terms of the contract, and that appellant could properly only make estimates, and payment of the same, for eighty-five per cent of completed portions of the tunnel. It appears from the contract that a great deal of the work was required to be performed by the contractor, such as pumping, building shafts, breakwater protection, etc., all of which was necessary to the completion of the finished tunnel. An instance of this was the box-headings. The method of construction required the excavation of two small bores or tunnels on each side of the main tunnel. In these were erected vertical forms, in which were fashioned the concrete side walls of the tunnel. For all that appears this was the proper and necessary method of construction. There was a dispute between the contractor and the city as to the value of these box-headings. The commissioner of public works, whose duty it was, under the contract, to decide such matters, was unwilling to allow more than the sum of $12 per foot, which the city engineer had fixed as the price for this work. The city council by its order directed the commissioner to allow the

sum of $20 per foot. Even if it be conceded that the city council, other than by an ordinance duly and legally passed, could make any order in the premises that would be binding, such order or action of the city council can only be regarded as advisory to the commissioner, whose decision was final in the matter, and was made in good faith on the contractor's estimate of the actual cost of this part of the work. It must be remembered that appellant never paid out more than eighty-five per cent of any estimate and the fifteen per cent of the contract price was always held in reserve. The estimate may have been too high, and the evidence is in conflict on that point, but the city was not to blame under the circumstances. The estimate was made by the person authorized by the contract to make it and as provided in the contract. It further appears from the evidence that no part of the fifteen per cent to be held in reserve was paid to the contractor, as was done in the case of *Calvert* v. *London Dock Co. supra,* and other cases cited to support appellee's contention on that point.

It was further provided in the contract that in case said contractor failed to complete the work the city of Chicago should be authorized to pay any laborers that may have been employed by such contractor upon said work, out of the funds due said contractor without giving the contractor notice of its intention to do so, and the city comptroller was authorized to ascertain and pay such amounts. The evidence shows that the fifteen per cent held in reserve by the city, or an amount equal to such reserve, was paid out as follows: $807.18 was paid out on liens claimed for labor done on behalf of Agnew when he was working on the contract; $9943.29 was paid out by the city for coal, supplies and labor, maintaining the condition of the plant, and in pumping water and sewage from the excavation for the tunnel and keeping things in shape in the tunnel. The city was obliged to make these expenditures anyway, and could just as well claim it had paid these amounts from other funds and still

held the fifteen per cent reserve at the time this suit was brought. It is nowhere shown by the evidence that this was to the detriment of the appellee or prejudicial to its interests, and if it was prejudicial it was incumbent upon appellee to show that fact. Appellant could have held this fifteen per cent reserve and the labor claims would necessarily have to be paid by appellee in the end, and if the work had been entirely abandoned and the excavation allowed to become filled up with water and debris, then a much more serious loss would have resulted to the appellee therefrom. Besides, as we understand the contract, it was necessary for the public health and safety to pump out the sewage and storm water that accumulated in the tunnel during the work of construction, and it can hardly be conceived how the necessary expenses of keeping the work intact so far as it had gone would not be beneficial to all parties concerned, and to appellee more than anyone else.

As to the third contention of the appellee, there were a great many things required to be done by the contract and which are set out in the contract and in the specifications, which were included in the contract price of $138.33 per lineal foot of the completed tunnel. Section 5 of the specifications provided: "The contractor shall for the price bid per lineal foot furnish all materials and labor and do all the work described in this specification, making the requisite excavations for building the tunnel, etc., and its appertaining constructions and connections for removing all obstructions; shall do all the ditching, pumping, bailing and draining; all sheeting and shoring; shall make all provisions necessary to maintain and protect all buildings, walls, fences, trees, gas pipe, water pipe, conduits, sewers, railing and other structure, and shall repair all damages occurring to same during the progress of the work; shall provide watchmen, fences, red lights, and other precautionary measures necessary to the protection of the personal property; shall provide all shields, centers and forms; shall

construct all foundation, all brick, concrete, stone and timber work," etc. The specifications also provided for the construction of a shaft to be located on Lawrence avenue, projected eastward from the shore line of the lake, from which the tunneling would be carried on. The vertical side walls of the tunnel were to be built in box-headings ahead of the arch. The ground was to be excavated for the shaft in open trench, the trench to be sheeted, and provision was to be made to keep all work dry during construction, all water to be removed by bailing, pumping or otherwise. All streets and adjacent buildings were to be effectually supported by timber, all timber and sheeting to be left in the excavation, except such timbers as might be necessary to be removed for construction of the shaft. The contractor was required to install a pumping plant, with pumps, pipes and all appurtenances, the pumps to be centrifugal, not more than three in number, and of an aggregate capacity of 12,000 gallons per minute against the head. This was to take the place of a temporary pumping station in operation on the conduit then in place, discharging the sewage and water and operated by the city. The contractor was required, as a part of the contract, from October, 1905, to maintain and operate the said pumps continuously day and night, discharging all sewage and storm water into the lake; to keep down water of said conduit at or below a plat of eight feet below city datum until March 31, 1906, and after that and until the completion of the contract at fourteen feet below city datum, and to be required to operate said pumps after the completion of the contract and the completion of the tunnel and other work at the rate of $25 per day of twenty-four hours after the tunnel was accepted, fifteen per cent of that amount to be retained until the pumps were ordered stopped by the commissioner.

In the case of *Smith* v. *Mollenson,* 148 N. Y. 241, this precise point was under consideration. In that case the court said: "It appears that the granite required was to be

quarried in Nova Scotia, transported from the quarry to a place in Connecticut, where it was to be dressed, and then transported to New York and set in the building. The work involved in the preparation and carriage of the material was by far the most expensive part of the contract, and it appears that the contractors had no means to meet this outlay except the monthly payments, so that if they could realize nothing until the stone was placed in the building they would be practically unable to perform the contract at all. This would be an unreasonable construction, and would, if acted upon, operate so oppressively as to place the contractors at the mercy of the owner;—a view that is always to be avoided when possible. (*Russell* v. *Allerton,* 108 N. Y. 292.) It would deprive them of all right to monthly payments except when and to the extent that granite had actually been placed in the walls, however large their outlay for procuring and preparing the material may have been during the month. The parties had the right to give to the expression, 'work performed on the building,' a broader meaning, which materials could very properly include the value of any work done or materials procured under the contract towards its erection although the granite procured and prepared had not yet been placed."

It is also objected that appellant disregarded the provisions of the contract by not paying on the sixth day of each month vouchers given on the preceding month, up to eighty-five per cent. As we have shown, the first payment made to Agnew was after he had been working for several months on the tunnel. We do not regard the manner of payment as material as long as Agnew did not receive more than eighty-five per cent of the vouchers issued to him at any one time. It would not be considered a serious violation of the contract to make the payments as they were made if that amount was owing.

It is further objected that appellant failed to appraise Agnew's construction plant. This construction plant was

assigned by Agnew to the city. There is no evidence in the record that this pumping plant was not appraised. On the contrary, the record shows that the plant was taken over by the contractor who furnished the work, the T. H. Mc-Govern Company, at the appraised value of $13,500, so that it appears that not only was there an appraisement, but the city was given credit for the amount of the appraised value and the claim of appellant against appellee, as surety on the bond, lessened by that much. The item of $10,800 bonus paid to the T. H. McGovern Company could only go in money advanced to diminish the amount claimed under the bond, and that amount was allowed to appellee by the trial court and need not be further considered here. It appears beyond question that the whole trouble with the Agnew contract was that his bid was too low. His bid was for $138.33 a foot, and after he had done a large part of the work, which we infer from the evidence was to a great extent utilized by the contractor who finally completed the work, the last contractor charged to complete the tunnel the price of $159 a foot, or a total of $102,353.41 more than the price in the Agnew contract. Assuming, as we must, that either Agnew or his surety, appellee, stood to lose that amount on the contract, it is proper to take that fact into consideration in determining whether any of the acts of appellant which are complained of constituted a change in the contract or worked in any way to the material damage of appellee as surety.

In considering the cases which follow the ruling in *Calvert* v. *London Dock Co. supra,* all of them are based on the holding that the departure from the contract was such as to work a hardship on the surety on the bond and the obligee in the bond by paying more than the proportionate payment which the contract called for, which took away from the contractor that particular pressure which by the contract was intended to be applied to him by paying out money that should have been retained and the retention of which

would have induced him to complete his work as per contract; that advances beyond the terms of the contract are in the nature of parting with securities possessed by the creditor, which should not be done without the knowledge and consent of the surety. In *Central Lumber Co.* v. *Kelter,* 201 Ill. 503, this court held the failure of the owner to withhold payments on a building contract did not preclude his resort to a bond given for the faithful performance of the contract, although the contract provided that payments should be made in accordance with the Mechanic's Lien act as amended in 1891, fixed a time for making partial payments and final payment, and recited that the "twenty per cent agreed to be reserved shall be held by the proprietor as security," etc. It was there said: "The contention of counsel is, that if they had strictly complied with the terms as to payments and withholding the twenty per cent they could have protected themselves against loss without resorting to the bond, and that they owed it to the security to do so. That, we think, is hardly a fair construction of the bond and contract. It would render the bond wholly unnecessary and of little or no benefit to the plaintiffs. If they were bound to protect themselves against loss occasioned by Rafferty's failure to perform the contract by withholding payments, then the security conditioned for his faithful performance would avail nothing."

On the whole, we do not think that there was such a departure from the terms of the original contract by appellant, or such a change in its terms, or other action on the part of appellant, as would operate as a release of the surety in this case.

For the reasons given, the judgment of the Appellate Court will be reversed and the judgment of the municipal court will be affirmed.          *Judgment reversed.*